Filed 4/25/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EDWARD HARRY, | B286084 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC581667) |
| v. | |
| RING THE ALARM, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Reversed and remanded.

Lederer & Nojima, David J. Lederer, Casey A. Hultin; Esner, Chang & Boyer, Holly N. Boyer and Shea S. Murphy for Plaintiff and Appellant.

Friedenthal, Heffernan & Brown, Kevin N. Heffernan, Jay D. Brown for Defendant and Respondent James Goldstein.

## INTRODUCTION

Appellant Edward Harry worked as a site representative during an event at a noted architectural residence owned by respondent James Goldstein. While giving a tour during the event, Harry fell from a platform suspended over a hillside, sustaining serious injuries. Harry sued Goldstein and Ring the Alarm, LLC, the entity that hired him and hosted the party.

Harry's claims against Goldstein for negligence and premises liability proceeded to trial. At the close of evidence, Goldstein asserted a defense under the "firefighter's rule," a subset of the doctrine of primary assumption of risk. The trial court agreed that the defense was applicable and instructed the jury accordingly. The jury found in Goldstein's favor.

On appeal, Harry contends the trial court erred in determining that the firefighter's rule applied. We agree. The circumstances presented in this case do not fit under the primary assumption of risk doctrine, as Harry was not expressly hired to manage the hazardous condition that injured him. Nor do we find any public policy in favor of applying such a bar. As such, the court erred in instructing the jury on this issue and in including the defense as the first two questions on the special verdict. The jury's findings for Goldstein on this defense, which barred all liability, compel reversal and remand for a new trial.

## FACTUAL AND PROCEDURAL HISTORY

Harry filed his complaint in May 2015, asserting claims for negligence and premises liability against Ring the Alarm and Goldstein. The court granted summary judgment in favor of Ring the Alarm in November 2016. In August 2017, the case proceeded to jury trial on Harry's claims against Goldstein.

### I.    *Evidence at Trial*

####    A.    *The Sheats-Goldstein House*

The incident occurred at the Sheats-Goldstein House, a residence in Beverly Hills designed by architect John Lautner. Goldstein purchased the house in 1972. He began renovating the house in 1979; he testified that construction to the house and property has been ongoing ever since. Goldstein worked with Lautner to restore the house to its original design. After Lautner died in 1994, Goldstein worked with Lautner's former

2

assistant, Duncan Nicholson. Nicholson acted as the architect on the house until he died in about 2015.

Goldstein began to add structures and improvements to the property in the 1990s, including the platform at issue here. The concrete platform, designed by Nicholson, is cantilevered out from the hillside below the house, and is designed to look as if it is floating. The platform has a diamond shaped piece of glass at the tip, set into the concrete structure. To reach the platform, one descends a set of cantilevered stairs from the main house. From the landing of the platform, visitors can view the glass "art piece" and look out over the hillside to views of the city. From the platform landing, a pathway continues through the garden to the James Turrell Skyspace, a concrete bunker with a light installation by artist James Turrell.

Goldstein testified that he had never discussed the subject of placing railings on the stairs or platform with Nicholson. He stated that the stairs and platforms were designed to be beautiful, and adding railings would have "made it look ugly." He also testified he did not think the platform was dangerous: "if someone is careful and watches where they're going, there's no danger." Goldstein stated that he walked around the property at least weekly, to see if anything looked out of place or needed repair, such as light bulbs needing to be replaced.

Harry Ernst, who worked construction on the property for 20 years, including construction of the platform, testified that he did not think the platform was safe due to the lack of railings.

B.    *Site Rentals*

Goldstein began renting the property in the 1990s for events such as parties, architectural tours, photography, and movie shoots. The rental contract between Goldstein and the renter included a number of event rules, including a requirement that two site representatives must be present at all events. The site representative acted as a site manager and a liaison between the property owner and the renter. Goldstein did not employ the site representatives directly. Instead, through his assistant, he provided renters with a list of approved representatives, and the renter was responsible for hiring the site representatives for the event. The list of approved site representatives was ranked by longevity, so the representative

who had been working with the property the longest got the first call for a job.

New site representatives were trained by the more senior site representatives. David Steel, who worked as the lead site representative at the property for over a decade, testified that there was a lot of training involved due to the "unique" features of the property. When training other representatives, Steel would talk about the house and point out "certain hazards of the house, of the property." Neither Goldstein nor his assistant, Roberta Leighton, did any of the training.

Goldstein testified that the job of the site representative during events was "to ensure safety of the house. . . . To make sure that, for example, drinks aren't brought in the house that might be spilled, smoking won't take place in the house, that people won't walk into the glass walls. Anything that could be harmful to the house needs to be watched over carefully." He noted that if someone walked into one of the glass walls, it could harm both the glass and the person. Leighton agreed that site representatives "are there to protect the house."

Goldstein restricted access to the garden and surrounding structures during events. He allowed tours to the Turrell building only by request, and with his approval. The tours were given by the site representative. Generally, a tour to the Turrell building would include a stop at the cantilevered platform, where the site representative would talk about the platform. Then the group would continue down the pathway to the Turrell building. On a rare occasion, a docent from a museum or architecture firm would give an architectural tour; Harry testified that they were given talking points for these tours, and were instructed to be careful.

Harry began working as a site representative at the house in 2006 and became the lead after Steel's departure at the beginning of November 2014. Harry testified that his duties as a site representative were to let the renters do what they contracted to do at the property and "protect the property per the house rules," as well as to "keep everyone happy . . . keep everything flowing." He also gave tours to the Turrell building, which usually included 10 to 12 people, but no more than 15 people at a time.

Prior to the accident, Harry had given over 200 tours to the Turrell building, including over 100 tours at night. He testified that the site representatives conducted the tours because "we generally don't let people go down into the gardens on their own. It's dangerous." Harry stated that the main focus of his job was protecting the house from damage. When asked about his duties on the platform, he gave the following responses:

"Q: When you're on the platform, you keep people away from the edges, correct?

"A: I don't let them fall on purpose, of course, but . . .

"Q: . . . Is that part of your job?

"A: I would warn them that the place is dangerous.

"Q: . . . When you did the tours of the platform, is one of your duties as a site rep to warn them to stay away from the edges?

"A: I tell them to be careful.

"Q: . . . So that they don't fall over the edges?

"A: Yes.

Q: Okay. And that's part of what you do as a site rep, correct?

"A: A part of it."

Harry also testified that he would warn people on the tour to be careful because there were no railings.

C. *The Accident*

On November 6, 2014, Harry was working as a site representative at the house for a record label launch party thrown by Ring the Alarm. The event had been approved for a "limited amount of tours" to the Turrell building. According to Harry, he conducted tours from about 7:00 p.m. to 9:00 p.m. Then he took a break and complained to the head of security, Chris Ramirez, that the "security guards hadn't been controlling the flow" of people on the tours. Around 11:00 p.m., the event host asked Harry to give one more tour. Harry agreed.

Harry testified that as he reached the platform, he turned around and saw a "never-ending line of people" coming down the stairs and onto the platform. During tours, he usually stands on the left side of the platform so that he does not block the view. However, in that instance, because of the crowd, he decided to stand on the right side of the platform, because it was

5

closer to the steps and pathway where the tour would continue. Harry explained he was concerned that if he stood where he normally did, "with all these people, I would have to split the crowd and force people towards the edge" to get to the pathway. As the platform kept filling up, he noticed "this is not safe. There is [*sic*] too many people." The entire platform was full of standing people, except for the glass tip. Harry finished his talk and started to move to the pathway. He testified that he stepped to the right as he always did (when he stood on the left side), without looking down, and fell off the platform to the hillside below. Harry claimed the platform was very dark that night and he thought one of the lights might have been out. But he acknowledged that crowding issues on the platform were a bigger factor in his fall than the lighting.

Kevin Shapiro, a guest at the event, testified that he was on the tour when Harry fell. He saw Harry standing on the platform, talking about the glass, and asking people to stay off the glass because it wasn't safe for multiple people to stand on it. According to Shapiro, Harry began moving backward while talking, then stepped backward and fell off the back of the platform. Goldstein testified that a week after the accident, Harry told him that he "tried to walk around the people that were on the tour" and fell off the platform.

Harry sustained several spinal fractures as a result of his fall. He sought over $2.5 million in damages at trial.

D. *Expert Testimony*

Both parties presented expert testimony about safety and engineering issues. Brad Avrit, plaintiff's expert, opined that the platform was dangerous, as it was an area "where people are congregating" with no guardrail protection, a drop off the platform of over ten feet onto a hillside, an edge that was was poorly defined with lush plants growing around the sides of the platform, and "poor lighting." Avrit pointed out building code violations regarding the lack of a guardrail and insufficient lighting.

Avrit measured a ten-foot drop from the concrete portion of the platform to the hillside below; because the hillside sloped away from the platform, the drop from the glass tip of the platform was 15-16 feet. He testified that the drop from the place Harry fell was 7.5 feet. Avrit suggested

6

several safety measures that could be implemented to protect against a dangerous fall, including the addition of railings, planters, or fencing to keep people off the edge of the platform. Avrit stated that having a site representative present was not an adequate safety measure, because "you can't use human beings as guardrails. That's not a reasonable option." Based on his review of Harry's deposition testimony, Avrit testified that Harry was "attempting to provide safety for the guests that were at the property . . . and it put him in a precarious position, given the number of people that were on there. . . . He had to have his back to the hazard to keep people away." As such, he opined that working on the platform exposed Harry to "extreme danger," and the lack of safety measures caused the fall. He acknowledged that Goldstein did employ a safety measure under the rules of the property, in that no one was allowed down to the platform without being guided by a site representative. But Avrit testified that was an "absurd safety measure" because it didn't adequately protect anyone from falling.

Defendant's expert, Jay Preston, opined that while there was "certainly a hazard" on the platform, the efforts to control the hazard were "adequate under the circumstances in that no one was allowed down [to] that platform without a site representative being present." He noted that it was Harry's job to "ensure that visitors were kept safe and away from that artistic edge of the platform" and testified that it was a reasonable way to deal with the risk to have trained personnel as mandatory escorts. However, he acknowledged during cross-examination that an "artful guardrail" would be the best solution to control the hazard.

## II.    *Jury Instructions and Verdict*

After the close of evidence, the parties submitted proposed verdict forms and jury instructions to the court. Goldstein requested an instruction and verdict regarding an affirmative defense under CACI No. 473, primary assumption of risk. Harry submitted a brief in opposition and the court heard argument on the issue. Goldstein's counsel argued that Harry "accepted working on the platform without a railing" and in low lighting, and "accepting inherent risk is what this instruction is all about." Harry's counsel disagreed, arguing that there was no evidence that the occupation of site representative involved the inherent risk of falling off a platform; rather,

7

"the vast majority of Mr. Harry's job duties had to do with keeping the property safe. So realistically, this is not what this jury instruction is meant for."

The court noted that it had reviewed the use notes for CACI No. 473, as well as the relevant case law, and stated that "it's clear that what I need to do is consider the nature of the activity here before the court and the relationship of the plaintiff and the defendant to the activity." The court concluded that it would instruct the jury with CACI No. 473 and accepted Goldstein's proposed special verdict form. The court reasoned that given "the unique features of this Goldstein property, including the floating balcony, . . . it's possible the jury could find that the unique features make the tour guide's job here somewhat perilous if care is not taken." The court also noted that both Goldstein and Harry were "very, very familiar with this property. The risk here was open, it was obvious, it was well known to both the plaintiff and the defendant." Further, while the court agreed that "the primary focus of at least Mr. Goldstein's concern was to make sure that his property was not damaged, it's clear from Mr. Harry's testimony that safety was a factor."

Accordingly, the court instructed the jury using CACI No. 473 as follows:

"Plaintiff, Edward Harry, claims that he was harmed by the negligence of defendant, James Goldstein, while Edward Harry was performing his job duties as a site representative at James Goldstein's property. James Goldstein is not liable if Edward Harry's injury arose from a risk inherent in the occupation of site representative. However, Edward Harry may recover if he proves all of the following:

1. That James Goldstein unreasonably increased the risks to Edward Harry over and above those inherent in being a site representative;

2. That Edward Harry was harmed; and

3. That James Goldstein's conduct was a substantial factor in Edward Harry's harm."

The first two questions on the special verdict form reflected the primary assumption of risk defense. The first question asked: "Did plaintiff

8

Edward Harry's fall arise from a risk inherent in his occupation as a site representative at defendant James Goldstein's property?" The jury answered "Yes." Because that answer was yes, the jury was instructed to proceed to the second question: "Did defendant James Goldstein unreasonably increase the risks to plaintiff Edward Harry over and above those inherent in plaintiff Edward Harry's occupation as a site representative at the subject platform on defendant James Goldstein's property?" The jury answered "No." Given this answer, the jury was instructed to answer no further questions and to sign and return the verdict.

The court recorded the jury's verdict and entered judgment in Goldstein's favor. Harry timely appealed.

## DISCUSSION

Harry contends the trial court erred in concluding that the primary assumption of risk doctrine applied to this case and further, that the error was prejudicial. We agree on both points.

### A. *Standard of Review*

The central issue here is whether the trial court erred in finding that the primary assumption of risk doctrine applied. "The existence and scope of a defendant's duty of care in the context of primary assumption of the risk is a legal question to be decided by the court" and therefore reviewed de novo on appeal. (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 766 (*Ford*), citing *Knight v. Jewett* (1992) 3 Cal.4th 296, 313 (*Knight*).) Similarly, we review de novo Harry's claim of instructional error. (See *Ford, supra*, 139 Cal.App.4th at p. 766; *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

### B. *Primary Assumption of Risk Doctrine*

As a general rule, persons are liable for injuries they cause others as a result of their failure to use due care. (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 536 (*Neighbarger)*; *Knight, supra*, 3 Cal.4th at p. 315.) The only exceptions to this rule are those created by statute or clear public policy. (*Neighbarger, supra*, 8 Cal.4th at p. 537.)

The doctrine of primary assumption of risk is an exception to the general duty of care. (*Gregory v. Cott* (2014) 59 Cal.4th 996, 1001 (*Gregory*).)

9

"Primary assumption of risk is a complete bar to recovery.  It applies when, as a matter of law, the defendant owes no duty to guard against a particular risk of harm."[1]  (*Ibid.*)  Thus, "the doctrine of assumption of risk properly bars a plaintiff's claim only when it can be established that, because of the nature of the activity involved and the parties' relationship to the activity, the defendant owed the plaintiff no duty of care." (*Neighbarger, supra*, 8 Cal.4th at p. 538; see also *Knight, supra*, 3 Cal.4th at pp. 313, 314-315.)

The duty to avoid injuring others "normally extends to those engaged in hazardous work." (*Neighbarger, supra*, 8 Cal.4th at p. 536.)  "We have never held that the doctrine of assumption of risk relieves all persons of a duty of care to workers engaged in a hazardous occupation." (*Id.* at p. 538.)  However, a variant of the primary assumption of risk doctrine developed in the context of claims arising from inherent occupational hazards, under the "firefighter's rule." (*Gregory, supra*, 59 Cal.4th at p. 1001; see also *Neighbarger, supra,* 8 Cal.4th at pp. 538–540.)  Under the firefighter's rule, "a member of the public who negligently starts a fire owes no duty of care to assure that the firefighter who is summoned to combat the fire is not injured thereby." (*Neighbarger, supra,* 8 Cal.4th at p. 538.)   Similarly, a person whose conduct precipitates the intervention of a police officer owes no duty of care to the officer "with respect to the original negligence that caused the officer's intervention." (*Ibid.*, citing *Walters v. Sloan* (1977) 20 Cal.3d 199.)

"Whether a duty of care is owed in a particular context depends on considerations of public policy, viewed in light of the nature of the activity and the relationship of the parties to the activity." (*Gregory, supra*, 59 Cal.4th at pp. 1001-1002, citing *Neighbarger*, *supra*, 8 Cal.4th at p. 541; see also *Knight, supra*, 3 Cal.4th at pp. 314–315.)[2]  For example, in *Gregory*, the

---

[1] By contrast, "[s]econdary assumption of risk applies when the defendant does owe a duty, but the plaintiff has knowingly encountered a risk of injury caused by the defendant's breach." (*Gregory, supra*, 59 Cal.4th at p. 1001.)

[2] Thus, "the plaintiff's subjective appreciation or acceptance of the foreseeable occupational hazard involved is immaterial." (*Moore v. William Jessup University* (2015) 243 Cal.App.4th 427, 435.)  Where defendant owes a duty, those subjective factors are properly considered under the rules of comparative negligence.  (See *Gregory, supra*, 59 Cal.4th at p. 1001; see also

10

Supreme Court applied the rule to bar liability against a woman suffering from Alzheimer's disease after she injured the home health care worker hired to care for her. (*Gregory, supra*, 59 Cal.4th at pp. 1000-1001.) The court found that the doctrine was properly applied "in favor of those who hire workers to handle a dangerous situation. . . . In effect, we have said it is unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." (*Id.* at p. 1002.) The court also noted that this rule "encourages the remediation of dangerous conditions, an important public policy. Those who hire workers to manage a hazardous situation are sheltered from liability for injuries that result from the risks that necessitated the employment." (*Ibid.*) The *Gregory* court also considered the important public policy in "minimizing the institutionalization of the elderly and disabled," a policy promoted by a rule allocating the risk of harm to the trained health care provider, rather than to the patients and their families. (*Id.* at pp. 1005, 1014-1015.)

Similar reasoning has led to application of the rule to bar claims by veterinarians, their assistants, and commercial kennel workers for injuries caused by animals entrusted to their care. (See *Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1122.) On the other hand, in *Neighbarger, supra*, 8 Cal.4th at pp. 542-543, the Supreme Court declined to apply the rule to an action brought by safety supervisors at an oil company. There, the plaintiffs were injured by the actions of employees from an outside maintenance company. (*Id.* at p. 535.) The court concluded that primary assumption of risk did not apply, as there was no contractual relationship between the plaintiffs and the third party maintenance company. The third party had not "paid in any way to be relieved of the duty of care" toward the plaintiffs. (*Id.* at p. 543.) "Having no relationship with the employee, and not having contracted for his or her services, it would not be unfair to charge the third party with the usual duty of care" towards the plaintiffs. (*Ibid.*)

---

*Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 665 [noting that consideration of an "obvious danger" has been "merged into comparative negligence"].)

C.    *Analysis*

Goldstein argues that primary assumption of risk applies here because Harry's job as a site representative "included, by his own admission, warning the members of tours he was leading that the property was dangerous and that there were no guardrails to prevent them from falling"; further, Harry was injured "by the very thing he was hired to prevent - a fall off an unguarded platform."  We are not persuaded.

While there was no evidence at trial regarding a formal list of job duties for site representatives, it was undisputed that the job included giving tours on the occasions such tours were approved.  There was also evidence that during tours of the platform, site representatives would caution visitors about the unguarded edges.  However, it was also undisputed that Goldstein's expressed purpose for requiring that renters use site representatives was to protect his unique residence and ensure it was not damaged during events.

The firefighter's rule is applicable where "the risk of injury . . . is inherent in the [plaintiff's] occupation," and the plaintiff is injured by the very hazard he was hired to confront.  (*Gregory, supra*, 59 Cal.4th at p. 1006.)  There is no evidence in this case to suggest that Harry was hired to keep people from falling off the platform.  Indeed, Goldstein denied that the platform was dangerous.  He offers no evidence explaining why he would have required a site representative to protect against a danger he refused to acknowledge.

Goldstein attempts to parse aspects of Harry's job to show that *while* Harry was on the platform, his principal job was ensuring safety of the guests.  He cites no instance in which a court approved use of primary assumption of risk in this manner.  Rather, in the cases he cites, courts applied the doctrine to bar liability only where the plaintiff has assumed the risk of a hazard he or she was hired to manage or confront.  (See *Rosenbloom v. Hanour Corp.* (1998) 66 Cal.App.4th 1477, 1481 [no liability against shark owner from injury to shark handler hired to move the shark]; *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761, 1770 (*Herrle*) [no liability against Alzheimer's patient from injury to nurse's aide in convalescent hospital, as "the very basis of the relationship" between plaintiff and defendant is to

12

"protect [defendant] from harming either herself or others"]; *Moore v. William Jessup University* (2015) 243 Cal.App.4th 427, 429-430 [no liability against customer to UPS driver injured by lifting a box with mislabeled weight, as lifting heavy boxes was "a fundamental part" of the driver's occupation].)[3]

Moreover, it is not clear that Harry's job was centered on keeping the guests safe even during the portion of events he spent giving tours. While on the platform, he gave an informational talk about the features of the platform. Further, there was no evidence regarding what safety training, if any, he received from other site representatives, or what the job expectations were regarding warning guests or acting as a human buffer to the platform edge.

In addition, Goldstein has failed to identify any public policy reasons compelling the use of the firefighter's rule in this case, and we have found none. There was no contract between Goldstein and Harry; as such, Goldstein has not "paid in any way to be relieved of the duty of care." (*Neighbarger, supra*, 8 Cal.4th at p. 543.) Moreover, unlike many of the cases applying the doctrine, we see no broader incentive to allocate the risk to individual site representatives to protect against a dangerous condition. Instead, as the property owner, Goldstein was in the best position to evaluate available safety options and protect against these risks. (See *Herrle v. Estate of Marshall, supra*, 45 Cal.App.4th at pp. 1770–1771 ["It is the health care provider, not the patient, who is in the best position to protect against the risks to the provider rooted in the very reason for the treatment."].) Of course, whether Goldstein acted reasonably in accordance with a duty of care is properly evaluated by the jury under comparative fault principles.

_____

[3] Goldstein also cites *Fazio v. Fairbanks Ranch Country Club* (2015) 233 Cal.App.4th 1053, a case involving a performer's fall from a stage. The court found that primary assumption of risk applied, reasoning that falling off a stage is "an inherent risk for all stage performers," and that the risk "'cannot be eliminated without altering the fundamental nature'" of performing on stage. (*Id*. at p. 1059.) Regardless of the artistic value of the platform at issue here, there was no evidence suggesting that adding safety measures and/or restricting access onto the platform would alter the fundamental nature of the platform.

13

In light of our conclusion that the court erred, we must assess whether that error was prejudicial. "When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is reasonably probable that instructions allowing application of an erroneous theory actually misled the jury.'" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682, quoting *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 581, fn. 11; see also *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [reversal warranted upon a showing of "miscarriage of justice," where "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'"].) A "reasonable probability" in this context "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*Ibid*.)

Harry contends the trial court's erroneous application of the firefighter's rule was prejudicial to him. Goldstein does not address the issue of prejudice. We agree that the error was prejudicial. Because the firefighter's rule does not apply to bar liability, the court should not have instructed the jury with CACI 473. Additionally, it was error to include questions on the special verdict asking the jury to determine the applicability of the firefighter's rule.

Because the jury found, in the first two questions on the verdict form that (1) Harry's fall arose from a risk inherent in his occupation; and (2) Goldstein did not unreasonably increase the risks to Harry, it was instructed not to reach any other questions. Therefore, the jury never considered Harry's claims under comparative fault principles. Thus, it is reasonably probable that the court's error affected the verdict and a new trial is warranted.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial. Appellant is awarded his costs on appeal.

**CERTIFIED FOR PUBLICATION**

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J