Filed 12/19/19

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BEAU GORDON, | D075373 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CIVRS 1302604) |
| ARC MANUFACTURING, INC., et al., | |
| Defendants and Appellants; | |
| GOLDEN EAGLE INSURANCE CORPORATION, | |
| Intervener and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Donna G. Garza, Judge. Affirmed.

Law Offices of Muhar, Garber, Av & Duncan, Thomas M. Butler; Greines, Martin, Stein & Richland, Robert A. Olson, Cynthia E. Tobisman and Geoffrey B. Kehlmann for Defendants, Intervener, and Appellants.

Law Offices of Robert F. Brennan and Robert F. Brennan for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the discussion section, parts II and III.

Beau Gordon, a professional roofer, fell 35 feet through a "camouflaged hole" in a warehouse roof he was inspecting.[1]  For his resulting head injury, a jury awarded Gordon approximately $875,000 against the building's owner, ARC Manufacturing, Inc. (ARC) and Joseph M. Meyers.[2]

On appeal, the main issue is whether the trial court correctly refused to instruct on primary assumption of risk where, as here, defendants did not hire or engage Gordon. We conclude that primary assumption of risk does not apply, reject appellants' other contentions, and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Gordon has worked on several hundred roofs in his professional career.  West Pack, a prospective buyer of ARC's 64,000 square foot commercial building, engaged him to inspect the roof, determine if "anything was wrong," and estimate costs to repair. Gordon did not charge West Pack for the inspection.

When Gordon and another experienced roofer who accompanied him, Mark W., arrived at the warehouse, an ARC employee, Shayne H., told them the roof " 'leaks everywhere' " during rain and other roofers who had recently been on the roof reported

---

[1]     Gordon's true name is Calvin Leslie Gordon.  The complaint and judgment, however, identify him as Beau Gordon.

[2]     By stipulation, the court instructed the jury that for purposes of the verdict form, ARC and Meyers "are basically the same person."

Before trial, ARC and Meyers filed bankruptcy. Their insurer, Golden Eagle Insurance Corporation, intervened.  ARC, Meyers, and Golden Eagle are collectively referred to as appellants.  Together, ARC and Meyers are defendants.

that the southeast corner was unsafe. Gordon replied they would "steer clear" of that area. Shayne gave no other warnings and did not limit their access to the roof.[3] Gordon told Shayne that after looking inside for "potential trouble spots," he and Mark would go on the roof.

Inside the building, Gordon noticed only "a few little minor things"—nothing indicating the roof was dangerous. After climbing an interior ladder, Gordon opened the unlocked hatch and he and Mark went on the roof. They were not wearing fall protection gear. None was feasible for inspecting the flat roof and a parapet wall protected against falling off the edge.

At the southeast corner, Gordon saw degraded roofing materials, indicating a long-standing problem. The border of the damaged area was marked with orange paint—something professional roofers commonly do to warn of a dangerous area. Although this was "a very small portion" of the entire roof, Gordon was surprised ("dumbfounded") by the extent of damage there, since his inspection inside showed only minor problems. Gordon and Mark avoided walking near this area.

The remainder of the roof looked fine. After completing the visual inspection, the men walked back to the hatch, giving "wide berth" to the damaged section.

About 20 or 30 feet from the damaged area, and in an area where the roof was "absolutely and completely normal looking," the roof suddenly went out from under

---

3    Defendants' testimony differed. Shayne claimed that she warned Gordon that the roof was "very unstable and didn't recommend anyone be up there." Another ARC employee testified that Shayne said to Gordon, "Don't go on the roof" and "Quote it from the ladder." Appellants concede, however, that except with respect to their instructional error argument, the facts must be stated in the light most favorable to the judgment.

3

Gordon.  Instinctively, he extended his arms over the hole, supporting himself while his legs dangled through the opening.  Mark laid flat and grabbed onto Gordon's arm.

Inside, a forklift driver raised a pallet underneath Gordon's legs, but even at its maximum extension, was 15 feet too short.  Five minutes later, the roof around Gordon collapsed, pulling Mark towards the hole.  He let go of Gordon because he "didn't want to die."  Gordon landed on the upraised pallet and then fell the remaining 20 feet to the floor, striking his head.

Mark explained that Gordon fell because rotted wood was concealed under a new covering (cap sheet):

> "Q:  [W]hen you came up out of the hatch, . . . was there a safe path way from the hatch to the rest of the roof that avoided the dangerous area?
>
> "A:  Yes.  In fact, we were on that same safe path with no indication whatsoever on our return that the roof—you have to understand, the roof was not in any way visibly damaged, defrayed, even the granules which would—which would deteriorate was—were still in place.  The granules, which are the first things to give up in a deteriorated condition—the granules fall off and then it's a black roof.  Well, the granules were perfect.  The roof was a hundred percent camouflaged hole where he fell through and the surrounding areas."

The jury determined defendants were negligent and awarded Gordon $874,934.45.

## DISCUSSION

### I. *THE COURT CORRECTLY REFUSED TO INSTRUCT ON PRIMARY ASSUMPTION OF RISK*

Defendants asked the court to instruct the jury with CACI No. 473 on primary assumption of risk, as follows:

4

"Beau Gordon claims that he was harmed by ARC Manufacturing or Joseph M. Meyers while Beau Gordon was performing his job duties as a roofer. ARC Manufacturing and Joseph M. Meyers are not liable if Beau Gordon's injury arose from a risk inherent in the occupation of a roofer. However, Beau Gordon may recover if he proves all of the following:

"1. That ARC Manufacturing or Joseph M. [Meyers] unreasonably increased the risks to Beau Gordon over and above those inherent in roofing;

"*or* that ARC Manufacturing or Joseph M. [Meyers] failed to warn Beau Gordon of a dangerous condition that Beau Gordon could not have known about as part of his job duties;

"*or* that the cause of Beau Gordon's injury was not related to the inherent risk;

"2. That Beau Gordon was harmed; and

"3. That ARC Manufacturing or Joseph M. [Meyers's] conduct was a substantial factor in causing Beau Gordon's harm."

The court refused, stating "Not every roof in and of itself, two feet off, or five feet off, is inherently dangerous which would warrant an assumption of the risk type of instruction."[4] On appeal, defendants contend that primary assumption of risk applies "as a matter of law to a roofer who is injured while inspecting a roof," or at least is a jury issue.

A. *Primary Assumption of Risk—An Overview*

"Generally, each person has a duty to exercise reasonable care in the circumstances and is liable to those injured by the failure to do so." (*Avila v. Citrus*

---

[4] We review only the correctness of the trial court's ruling, not its rationale. (*Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 100.)

*Community College Dist.* (2006) 38 Cal.4th 148, 160 (*Avila*).) "The only exceptions to this rule are those created by statute or clear public policy." (*Harry v. Ring the Alarm, LLC* (2019) 34 Cal.App.5th 749, 758 (*Harry*).)

"The traditional version of the assumption of risk doctrine required proof that the plaintiff voluntarily accepted a specific known and appreciated risk. [Citations.] The doctrine depended on the actual subjective knowledge of the given plaintiff [citation] and, where the elements were met, was an absolute defense to liability for injuries arising from the known risk." (*Avila, supra*, 38 Cal.4th at p. 161.)

"California's abandonment of the doctrine of contributory negligence in favor of comparative negligence [citation] led to a reconceptualization of the assumption of risk." (*Avila, supra*, 38 Cal.4th at p. 161.) In *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*), a plurality of the California Supreme Court stated there are two species of assumption of risk: primary and secondary. (*Id.* at pp. 308–309.)[5] "Primary assumption of the risk arises when, as a matter of law and policy, a defendant owes no duty to protect a plaintiff from particular harms." (*Avila*, at p. 161.) Secondary assumption of risk arises when the defendant owes a duty of care, but the plaintiff knowingly encounters the risks attendant on the defendant's breach of that duty. (*Knight*, at p. 308.)

"In primary assumption of risk cases, 'the question whether the defendant owed a legal duty [of care] to protect the plaintiff from a particular risk of harm does not turn on

_____

5    The holding in *Knight, supra*, 3 Cal.4th 296 was "subsequently accepted by all members of the Court except Justice [Joyce L.] Kennard . . . ." (*Luna v. Vela* (2008) 169 Cal.App.4th 102, 107 (*Luna*).)

the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity . . . in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity . . . .' " (*Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1121 (*Priebe*), italics omitted.)

Primary assumption of risk cases often involve sports and recreational activity where risks cannot be eliminated without altering the fundamental nature of the activity. (E.g., *Knight*, *supra*, 3 Cal.4th 296 [social game of touch football]; *Nalwa v. Cedar Fair*, *L.P.* (2012) 55 Cal.4th 1148 [amusement park bumper car ride]; *Luna*, *supra*, 169 Cal.App.4th 102 [tripping over a tie line used to secure a volleyball net]; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529 [horseback riding]; *Beninati v. Black Rock City*, *LLC* (2009) 175 Cal.App.4th 650 [plaintiff burned at the Burning Man Festival]; *Griffin v. The Haunted Hotel*, *Inc.* (2015) 242 Cal.App.4th 490 [fright from haunted house amusement].)

B. *Occupational Assumption of the Risk*

The duty to use reasonable care to avoid injuring others normally extends to those engaged in hazardous work. For example, highway workers who face the occupational hazard of working in traffic may recover for injuries caused by a third party's negligent driving. (*Neighbarger v. Irwin Industries*, *Inc.* (1994) 8 Cal.4th 532, 536 (*Neighbarger*).) This is because the roadworker's task is to fix the road, not to face oncoming traffic.

Although primary assumption of risk cases often involve recreational activity, the doctrine also applies in certain contexts involving inherent occupational hazards. "The bar against recovery in that context first developed as the 'firefighter's rule,' which

7

precludes firefighters and police officers from suing members of the public for the conduct that makes their employment necessary. [Citations.] After *Knight*, [*supra*, 3 Cal.4th 296,] . . . the firefighter's rule [was viewed] as a variant of primary assumption of risk, 'an illustration of when it is appropriate to find that the defendant owes no duty of care.' " (*Gregory v. Cott* (2014) 59 Cal.4th 996, 1001–1002 (*Gregory*).)

The firefighter's rule has been applied to other occupations where the defendant has "hire[d]" the plaintiff, who is injured from "risks that necessitated the employment." (*Gregory*, *supra*, 59 Cal.4th at p. 1002.) For example, in *Priebe*, *supra*, 39 Cal.4th 1112, the Supreme Court applied primary assumption of risk where a worker in a dog kennel sued the owner of a dog that bit her. The *Priebe* opinion identifies several policy rationales for applying primary assumption of risk. "The most fundamental is rooted in the very nature of the profession. When an owner entrusts a dog to the care of trained professionals, the owner is no longer in charge. The professional determines how best to manage the animal, and is in the best position to take protective measures against being bitten. [Citation.] A second basis for the rule is the contractual relationship between the parties. The defendant has retained the plaintiff for services that necessarily include the safe handling of the dog. [Citation.] A third reason, and one that justified extending the veterinarian's rule to kennel workers, is the social utility of allowing owners to place their dogs in kennels without the risk of liability. 'Encouraging the use of secure kennel boarding facilities . . . serves the salut[a]ry purpose behind the dog bite statute—that of protecting members of the public from harm or injury by dogs not properly under their owners' control . . . .' " (*Gregory*, at p. 1003.)

8

Courts have applied primary assumption of risk in other occupational settings including: in-home caregivers for an Alzheimer's patient (*Gregory*, *supra*, 59 Cal.4th 996); veterinary workers (*Priebe*, *supra*, 39 Cal.4th at p. 1132); package delivery drivers (*Moore v. William Jessup University* (2015) 243 Cal.App.4th 427); and shark handlers (*Rosenbloom v. Hanour Corp.* (1998) 66 Cal.App.4th 1477). Each of these cases involves a plaintiff who has been injured as a result of risk inherent in the task that the defendant hired or engaged the plaintiff to perform. The factual settings are united by the principle that "it is unfair to charge the defendant with a duty of care to prevent injury to the plaintiff arising from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." (*Neighbarger*, *supra*, 8 Cal.4th at p. 542.)

### C. *Primary Assumption of Risk Does Not Apply*

As a matter of law, primary assumption of risk does not apply in this case because defendants did not hire or engage Gordon, West Pack did. *Neighbarger*, *supra*, 8 Cal.4th 532 is controlling. There, the plaintiffs were oil company employees who were trained in industrial firefighting. (*Id.* at p. 535.) The defendant, Irwin Industries, Inc. (Irwin), provided maintenance services at the refinery under contract with plaintiffs' employer. (*Ibid.*) While installing a valve flange, an Irwin employee caused a flammable substance to be released. (*Ibid.*) Plaintiffs suffered burns when the substance ignited. They sued Irwin, which responded by moving for summary judgment based on primary assumption of risk (the firefighter's rule). (*Ibid.*)

The Supreme Court stated, "The central question to be answered in this case is whether [Irwin] and its employees owed a duty of care to plaintiffs." (*Neighbarger*,

9

*supra*, 8 Cal.4th at p. 536.) The court concluded that they did unless some recognized statutory or public policy created an exception. (*Id.* at p. 537.) Irwin asserted that the primary assumption of the risk doctrine created such an exception. (*Ibid.*) The court held that primary assumption of risk did not apply because Irwin had not hired or engaged the plaintiffs to confront the risk that resulted in their injuries. (*Id.* at 542–543.) The court reasoned that in the case of firefighters or other *public* safety officers, the public has paid them to confront a specific risk, such as fires. (*Ibid.*) "In effect, the public has purchased exoneration from the duty of care and should not have to pay twice, through taxation and through individual liability, for that service. [Citations.] But when a safety employee is privately employed, a third party [such as Irwin] lacks the relationship that justifies exonerating him or her from the usual duty of care. The third party, unlike the public with its police and fire departments, has not provided the services of the private safety employee. Nor has the third party paid in any way to be relieved of the duty of care toward such a private employee. Having no relationship with the [plaintiff], and not having contracted for his or her services, it would not be unfair to charge the third party with the usual duty of care towards the private safety employee." (*Ibid.*)

Recently, the court of appeal in *Harry*, *supra*, 34 Cal.App.5th 749 applied the same principle. There, the plaintiff worked as a "site representative" at a famous Beverly Hills house owned by James G. (*Id.* at p. 751.) James, who regularly rented out the house for parties, tours, and movie shoots, required renters to hire site representatives to protect the house from damage. (*Id.* at p. 753.) For a particular event, the renter hired plaintiff Harry. While working that event, Harry was injured when he stepped off a

10

raised outdoor platform (that had no railing). (*Id.* at p. 755.) He sued James. (*Id.* at p. 752.) At trial, the court instructed the jury on primary assumption of risk, and the jury returned a defense verdict. (*Id.* at pp. 756–758.) Reversing, the appellate court held that as a matter of law, primary assumption of risk did not apply because (among other reasons) there was no relationship between Harry and James, and as such, James "ha[d] not 'paid in any way to be relieved of the duty of care.' " (*Id.* at p. 761.)[6]

Here, as in both *Neighbarger* and *Harry*, defendants did not hire or engage the plaintiff. They did not engage Gordon directly, as a dog owner hires a kennel worker or a family member hires an in-home caregiver. Nor did they hire Gordon indirectly, as the public hires firefighters. There is no relationship between defendants and Gordon from which it could be inferred that defendants purchased exoneration from their otherwise applicable duty of care. Absent the requisite relationship, policies supporting the primary assumption of the risk doctrine do not apply and, therefore, the trial court correctly refused to instruct on primary assumption of risk.

Disagreeing with this analysis, defendants cite *Hodges v. Yarian* (1997) 53 Cal.App.4th 973 (*Hodges*), *Baker v. Superior Court* (1982) 129 Cal.App.3d 710 (*Baker*), and *City of Oceanside v. Superior Court* (2000) 81 Cal.App.4th 269 (*City of Oceanside*) to support applying primary assumption of risk where the defendant has not compensated the plaintiff. However, as explained below, these cases are materially distinguishable

---

6    Because *Harry*, *supra*, 34 Cal.App.5th 749 was decided after briefing was complete, we invited the parties to file supplemental briefs addressing the case, which we have reviewed.

11

because they all involve public service employees who received some measure of public compensation, either for their work or their injuries. In sharp contrast here, there is no evidence that Gordon is entitled to any public benefits or compensation. Unlike the cases defendants rely on, applying ordinary duty-of-care principles here does not result in defendants paying twice to compensate Gordon for his work-related injuries.

For example, in *Hodges*, *supra*, 53 Cal.App.4th 973, the court applied primary assumption of risk to bar a claim by an off-duty deputy sheriff against the managers of his own apartment building for injuries suffered when he confronted a burglar. (*Id.* at pp. 976–977.) Chief among the reasons for applying that rule was that off-duty peace officers are eligible to receive public compensation for injuries sustained in responding to suspected criminal activity. (*Id.* at p. 981; Lab. Code, § 3600.2, subd. (a).)[7] The *Hodges* court concluded that because the property owners "have already been taxed to provide these (and other) special benefits for deputy sheriffs such as [plaintiff], they are entitled to the benefit of the cost-spreading aspect of the public compensation system and should

---

[7]     Labor Code section 3600.2, subdivision (a) provides in part: "Whenever any peace officer, as defined in Section 50920 of the Government Code, is injured, dies, or is disabled from performing his or her duties as a peace officer by reason of engaging in the apprehension or attempted apprehension of law violators or suspected law violators, or protection or preservation of life or property, or the preservation of the peace, anywhere in this state . . . but is not at the time acting under the immediate direction of his or her employer, the peace officer or his or her dependents, as the case may be, shall be accorded by the peace officer's employer all of the same benefits, including the benefits of this division, that the peace officer or his or her dependents would have received had that peace officer been acting under the immediate direction of his or her employer. Any injury, disability, or death incurred under the circumstances described in this section shall be deemed to have arisen out of and been sustained in the course of employment for purposes of workers' compensation and all other benefits."

12

not have to pay again for injuries that are compensable in that system."  (*Id*. at pp. 981–982.)

Similarly, *Baker* involved volunteer firefighters paid only $5 per call but entitled to workers' compensation benefits for injuries suffered while fighting fires.  (*Baker*, *supra*, 129 Cal.App.3d at pp. 717–718.)  The *Baker* court held that "[t]he entitlement of injured volunteer fire[fighters] to workers' compensation benefits at the maximum rate regardless of actual earnings [citation] when coupled with their entitlement to all reasonably necessary medical treatment [citation] goes a long way" in justifying applying primary assumption of risk in that context.  (*Id.* at p. 718.)

Finally in *City of Oceanside*, *supra*, 81 Cal.App.4th 269, this court applied primary assumption of risk to publicly employed lifeguards who claimed they were inadequately compensated.  (*Id.* at pp. 279, 285.)  There, we noted that "[t]he firefighter's rule is based on the public policy that officers injured in the line of duty should be compensated through the public fisc rather than by individual tort recoveries."  (*Id.* at p. 275.)  Whether their compensation was "adequate" was a question for the legislative branch.  (*Id*. at p. 285.)

Generalizing from these cases, defendants contend that primary assumption of risk "is not strictly limited to cases in which the particular risk was assumed for compensation" and "does *not* turn on compensation."  And we agree that determining whether primary assumption of risk applies does not turn exclusively on the fact or amount of compensation.  (*Neighbarger*, *supra*, 8 Cal.4th at p. 544 [amount of compensation not "determinative"].)  Rather, the "the nature of the activity involved and

13

the parties' relationship to the activity" are the key considerations in determining whether primary assumption of risk applies. (*Id.* at p. 538.)

It is no small coincidence that the three cases defendants rely on each involve a public service employee. With respect to the volunteer firefighter in *Baker*, "The public nature of the service, combined with the understanding that the public good is best served by a quick response to fires without questions asked as to the cause of the fire, warrant a conclusion that the public should owe no duty of care to its firefighters, whether or not they are well paid." (*Neighbarger*, *supra*, 8 Cal.4th at p. 544.) Similarly, primary assumption of risk applies to the off-duty deputy sheriff in *Hodges* because he "performed a 'public' service" no different from what "he would have performed if on duty." (*Hodges*, *supra*, 53 Cal.App.4th at p. 983.) The policies supporting the firefighter's rule were applicable in *Hodges*, in part because having already been taxed to provide the officer with workers' compensation benefits, the defendant "should not have to pay again." (*Id.* at p. 982.) And in *City of Oceanside*, this court applied primary assumption of risk to publicly employed lifeguards, stating, "We discern no compelling reason to distinguish publicly employed lifeguards from publicly employed firefighters, police officers and emergency medical personnel for purposes of application of the firefighter's rule." (*City of Oceanside*, *supra*, 81 Cal.App.4th at pp. 279–280.) Thus, it is the public service nature of the relationship between the parties—not the fact or amount of private compensation—that drives the application of primary assumption of risk in these cases.

14

Significantly, there is no public employment relationship in this case. *Neighbarger*, *supra*, 8 Cal.4th 532 highlights the importance of this distinction. There, the court held that primary assumption of risk did not apply to *private* firefighting employees who defendant had *not* hired or engaged because the "defendant stands in a different relation to the private safety worker than members of the public stand to the public firefighter." (*Id*. at p. 542.) *Hodges*, *Baker*, and *City of Oceanside*—applying primary assumption of risk to bar claims by uncompensated or undercompensated public service employees—do not apply here for the same reason.

D. *Defendants' Privette Argument Does Not Compel a Different Result*

Approaching the duty issue from a different angle, defendants invoke *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), which they contend supports applying primary assumption of risk in this case. Before analyzing defendants' argument, a review of *Privette* and two post-*Privette* cases is helpful.

*Privette*, *supra*, 5 Cal.4th 689 holds that as a general rule, the hirer of an independent contractor is not liable for on-the-job injuries to the independent contractor's employees. (*Johnson v. The Raytheon Co.*, *Inc.* (2019) 33 Cal.App.5th 617, 628 (*Johnson*).)

In *Ruiz v. Herman Weissker*, *Inc.* (2005) 130 Cal.App.4th 52 (*Ruiz*), a power company employee was electrocuted while working on a power line project; his widow sued the project's contract administrator, which was the power company's agent. (*Id*. at pp. 56–58, 62.) We held that the policies supporting *Privette* also applied to the *hirer's*

15

*agent*, even though the agent did not have a contractual relationship with the decedent's employer.  (*Ruiz*, at p. 62.)

The third case pertinent to appellants' argument is *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*).  There, the Supreme Court created an exception to *Privette* for certain concealed hazards.  Under *Kinsman*, a landowner who hires an independent contractor may be liable for injuries to that contractor's employees where "the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this hazardous condition, and the landowner failed to warn the contractor about this condition."  (*Kinsman*, at p. 664, footnote omitted.)

Asserting that primary assumption of risk should apply even in the absence of any relationship between themselves and Gordon, defendants contend (1) *Privette* "is a particularized application of the primary assumption of risk doctrine"; and (2) under *Ruiz*, *supra*, 130 Cal.App.4th 52, defendants (acting as West Pack's agents for the roof inspection) would be entitled to *Privette* immunity; and (3) therefore, defendants are also entitled to assert primary assumption of risk to bar Gordon's claims.

This argument fails on each level.  First, defendants cite no case describing *Privette*, *supra*, 5 Cal.4th 689 as a form of the primary-assumption-of-risk doctrine.  The phrase "primary assumption" is not even in *Privette*, nor does it appear in *Kinsman*, *supra*, 37 Cal.4th 659.  Contrary to appellants' contention, the two doctrines are distinct.  Primary assumption of risk addresses *whether* the defendant owes the plaintiff a duty of

care (*Knight*, *supra*, 3 Cal.4th at pp. 308–309), whereas *Privette* addresses *who* owes the injured worker an admitted duty of care—the hirer, or the independent contractor.

Second, defendants' reliance on *Ruiz*, *supra*, 130 Cal.App.4th 52 is inapt because there is no evidence that defendants were West Pack's agent.  " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "  (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.)  "In order to create an agency, the principal must confirm authority upon the agent."  (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 983.)  "The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties."  (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1171.)

Defendants cite no evidence that West Pack had the right to control defendants with respect to the roof inspection.  " 'To permit a finding of agency upon this evidence would be, in effect, to hold that one who performs a mere favor for another, without being subject to any legal duty of service and without assenting to any right of control, can be an agent.  This is not the law.' "  (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620.)

In a related argument, defendants state, "It makes no sense to adopt differing rules depending on whether the injured roofer sues the warehouse buyer who hired him or the warehouse seller who was required to allow the buyer to inspect the property."  We disagree.  Applying primary assumption of risk depends on " 'the nature of the activity

17

*and the relationship of the defendant to the plaintiff.*' " (*Neighbarger*, *supra*, 8 Cal.4th at p. 545, italics added.) Applying the primary assumption of risk doctrine is error "when the defendant is a third party who has not secured the services of the plaintiff or otherwise entered into any relationship with the plaintiff." (*Ibid.*)

Defendants also rely on a portion of the Supreme Court's *Kinsman* opinion that states: "[T]he principles enunciated in *Privette* suggest that the landowner would not be liable when the contractor has failed to engage in inspections of the premises implicitly or explicitly delegated to it. Thus, for example, an employee of a roofing contractor sent to repair a defective roof would generally not be able to sue *the hirer* if injured when he fell through the same roof due to a structural defect, inasmuch as inspection for such defects could reasonably be implied to be within the scope of the contractor's employment." (*Kinsman*, *supra*, 37 Cal.4th at pp. 677–678, italics added.)

*Kinsman*, of course, was discussing the roofer's ability to sue the hirer. As we have emphasized here, the fundamental problem is that defendants did not hire Gordon. Moreover, defendants misread *Kinsman*, *supra*, 37 Cal.4th 659 by taking this quotation out of context. The *Kinsman* court addressed conditions under which a landowner who hires an independent contractor is liable when the contractor's employee is injured by a hazardous condition on the premises. As an exception to *Privette*, *supra*, 5 Cal.4th 689, the court held, "[A] landowner that hires an independent contractor may be liable to the contractor's employee if the following conditions are present: the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this

18

hazardous condition, and the landowner failed to warn the contractor about this condition." (*Kinsman*, at p. 664, italics and footnote omitted.) Elaborating, the court stated, "Thus, when there is a known safety hazard on a hirer's premises that can be addressed through reasonable safety precautions on the part of the independent contractor, a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if the contractor fails to do so. . . . [¶] *However, if the hazard is concealed from the contractor, but known to the landowner, the rule must be different.* A landowner cannot effectively delegate to the contractor responsibility for the safety of its employees if it fails to disclose critical information needed to fulfill that responsibility, and therefore the landowner would be liable to the contractor's employee if the employee's injury is attributable to an undisclosed hazard. Nothing in the *Privette* line of cases suggests the contrary." (*Kinsman*, at pp. 673–674, italics added.)

Thus, it was in the context of *open or known risks* that the *Kinsman* court stated, "an employee of a roofing contractor sent to repair a defective roof would generally not be able to sue the hirer if injured when he fell through the same roof due to a structural defect . . . ." (*Kinsman*, *supra*, 37 Cal.4th at pp. 677–678.) With respect to concealed hazards—such as the camouflaged hole in this case—*Kinsman* states the rule "must be different." (*Id.* at pp. 673–674.)

Defendants also contend that a property owner who "permits a roofer to determine whether a roof is unsafe or needs replacement cannot have a legal duty to *ensure* that the roof is safe . . . . After all, the only reason to call the roof inspector is to make that very

19

determination."  (Italics added.)  Defendants state that exposing a landowner to liability for a roofer's injuries would discourage owners from seeking professional assistance for roof repairs.

This argument fails because it is based on a canard—that we are imposing upon defendants a duty "to *ensure* that the roof is safe."  However, the jury was not told that defendants' duty was to ensure the roof was safe.  Rather, the court instructed with CACI No. 401, which required the jury to determine if defendants acted as "a reasonably careful person would have acted in [defendants'] situation."

Shayne testified she warned Gordon that "a few days prior" another roofer "quoted the roof and stated that it was very unstable and didn't recommend anyone be up there." Gordon and Mark testified that Shayne gave them no such warning.  As a landowner who had already been informed of the dangerous condition of the entire roof, in the exercise of reasonable care, defendants were in the best position to protect Gordon from the concealed condition that injured him.  (See *Harry*, *supra*, 34 Cal.App.5th at pp. 761–762.)[8]

---

[8]    We also reach the same result on other grounds because, as defendants' concede, primary assumption of risk applies only to risks inherent in the activity.  Although falling is an inherent risk of being on a roof (see *Jimenez v. Roseville City School District* (2016) 247 Cal.App.4th 594, 607 [when " 'gravity is at play with the human body, the risk of injury in inherent' "]), that does not mean that every time a roofer falls, it is because of an inherent risk of roofing.  The risk that a landowner will not disclose and/or warn of a concealed roof hazard he or she knows of is not an inherent risk of inspecting a roof. (See *Lipson v. Superior Court* (1982) 31 Cal.3d 362, 371 [risk that landowner will deceive a firefighter as to the nature or existence of a hazard "is not an inherent part of a firefighter's job"]; *Priebe*, *supra*, 39 Cal.4th at p. 1116 ["primary assumption of risk would not bar [plaintiff's] claim since she could not be found to have assumed a risk of which she was unaware"].)

## II. *SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S DETERMINATION THAT GORDON WAS NOT NEGLIENT*

The jury assessed no comparative negligence to Gordon. Defendants contend this "defies the undisputed evidence" that Gordon knew the roof was "in bad shape" yet walked on it anyway. Defendants assert that the judgment should be reversed "so that the jury can allocate some fault" to Gordon.

### A. *The Standard of Review*

Defendants concede that we review the jury's allocation of fault under the substantial evidence standard. " 'The gist of the "substantial evidence" rule is: [¶] "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." [Citations.] [¶] 'So long as there is "substantial evidence," the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result.' " (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429–430, fn. 5.)

### B. *Appellants Forfeited Their Sufficiency of the Evidence Challenge*

"[W]hen a losing party challenges the verdict for a lack of substantial evidence, they 'must set forth, discuss, and analyze all the evidence on that point, *both favorable and unfavorable.* [Citation.]' Defendants' 'fundamental obligation to this court, and a prerequisite to our consideration of their challenge' [citation], is to 'set forth the version of events *most favorable to* [*respondent*]' [Citation.] 'Accordingly, if, as defendants here

21

contend, "some particular issue of fact is not sustained, they are required to set forth in their brief all the material evidence on the point and not merely their own evidence. Unless this is done the error is deemed to be waived." ' " (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246; see also *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1326–1327.)

There are good reasons for this forfeiture rule. "Defendants raising a claim of insufficiency of the evidence assume[] a 'daunting burden.' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) Requiring an appellant to confront all the material evidence on a point, especially the "bad facts" before making a substantial evidence argument will lead to most substantial evidence arguments being left on the editing room floor, where they belong. Only by enforcing this forfeiture rule will reviewing courts and respondents' lawyers (and their clients) save the significant resources that are regularly spent responding to substantial evidence arguments that never should have been made.

Here, appellants claim the "undisputed" facts compel a finding of comparative negligence because Gordon conceded the roof deterioration in the southeast corner was substantial and he could not predict the extent of the water intrusion. Appellants assert that "the jury's no-fault finding is untenable" because "[d]espite [Gordon's] actual

knowledge and visible proof that the roof had suffered serious deterioration and water intrusion, he stepped out onto it and proceed to walk all over it."

Appellants have forfeited this argument because they fail to mention, much less analyze, the testimony of their own expert, who conceded that Gordon reasonably assumed the area where he fell was safe to walk on:

> "Q: The roofing crews that you have worked with, in your experience, if they see what appears to be relatively fresh cap sheet, do they, in your experience and observation, make the assumption that they can walk in those areas?
>
> "A: I think that would typically be the case.
>
> "Q: [¶] . . . [¶] When you have been on roofs with roofing crews and there may be one bad area of the roof, but the rest of the area appears to have smooth and intact and relatively fresh-looking cap sheet, do the workers walk over those cap sheets?
>
> "A: Typically. They might provide a wide berth, but typically they would try and find a safe area if one can be found.
>
> "Q: All right. And a roofer, an average roofer, if he sees an area of what appears to be fresh, intact, undamaged cap sheet, in your experience with your roofing crews, would that roofer assume that that was a safe area to walk?
>
> "A: They could assume that.
>
> "Q: All right. And if they walked in that area, would you necessarily criticize them for being careless?
>
> "A: It depends on the situation. If we are looking at—if it's a fresh, brand-new cap sheet that you can determine is new, no."
>
> "Q: [¶] . . . [¶] And I will represent to you that [Gordon] also testified that when he came out of the hatch and looked to his right, which would be to the north, that the damaged area and the painting started approximately ten feet to the north of the hatch, all right?

23

And for purposes of these questions, I'd just like you to assume that, whether or not you agree with it.

"A: All right.

"Q: All right. Now, given those assumptions, that Mr. Gordon pokes his head out and looks to the right and sees what appears to be a damaged area with paint around it, approximately ten feet to the right, or to the north, but he looks to the left and he sees cap sheet, which is intact and which looks relatively new and which is undamaged, do you criticize him for getting out of the hatch and turning left away from the damaged area?

"A: In the scenario as you described it, no.

"Q: All right. And because basically, he's avoiding the damaged area?

"A: Yes, correct, in your scenario.

"Q: Right, okay. In my scenario, and I understand you may not fully agree with it . . . . If he then conducts the rest of his roof inspection, avoiding the damaged area, and staying only in the areas where the cap sheet looks intact and fresh and undamaged, do you criticize him?

"A: No I do not."

"Q: It's not uncommon for a roof of this size, that one, one section of it may be damaged, but the rest of it is not?

"A: That makes sense."

In any event, even if not forfeited, the argument fails. Gordon testified that he gave "wide berth" to the damaged area, Mark described the area that collapsed as a "camouflaged hole," and responding to a hypothetical question incorporating Gordon's testimony, the defense expert conceded he had no criticism. Accordingly, substantial evidence supports the jury's finding of no comparative negligence.

24

### III. *THERE WAS NO MISCONDUCT IN CLOSING ARGUMENT*

Appellants contend the jury's assessment of zero comparative fault was "surely the result of passion and prejudice" ignited by Gordon's trial lawyer's "improper remarks, designed to prime the jury with animus towards the property owner." Specifically, appellants complain that in closing, Gordon's counsel (1) made a prohibited "golden rule" argument; and (2) made a personal attack on a defense witness in an attempt to portray defendants as villains.

#### A. *Gordon's Counsel Did Not Make a Golden Rule Argument*

In closing argument, over defendants' objection, Gordon's counsel stated:

> "This is how I like to think about general damages and how I think a lot of people like to approach general damages. Let's take one day before the accident. ARC Manufacturing calls Beau Gordon down to the office and says . . . you're going to have a terrible accident tomorrow and we are going to hurt you real bad [¶] . . . [¶] and some of the changes in your life are going to be permanent. [¶] Now, we have to give you money to make you undergo this. We have to make—give you money to withstand this. How much money do we have to give you—how much money do we have to pay you to go through and undergo about—what we are about to put you through? [¶] See, you're giving Mr. Gordon a chance to actually negotiate the value of his own damages when you look at it that way."

"A 'golden rule' argument indicates to the jury that it would be proper in calculating damages to place themselves in the plaintiff's shoes and award the amount they would 'charge' to undergo equivalent disability, pain and suffering." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305). "That argument is improper because it asks the jury to place themselves . . . in a plaintiff's position, effectively urging them to become advocates for the plaintiff." (*Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 604.) This argument is also impermissible

25

because the only person whose pain and suffering is relevant to the calculation of damages is the plaintiff.

Citing *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867 (*Collins*), defendants contend Gordon's lawyer improperly invited jurors "to put themselves in plaintiff's shoes."  In *Collins*, the plaintiff's lawyer "argued that the jury should consider its decision by imagining an ad in the newspaper seeking a surrogate victim, someone who would come in to have the same type of injury as the plaintiff; counsel asked the jury to consider what fee would compensate for that injury."  (*Id.* at p. 883.)  The *Collins* court held that this "surrogate victim" argument was a golden rule argument because counsel effectively asked the jury to place itself in the victim's shoes and award such damages as they would charge to undergo equivalent pain and suffering. (*Ibid.*)

The vice in the golden rule argument is that it asks jurors to consider the worth of the plaintiff's pain and suffering *to them*.  Here, however, Gordon's attorney did not ask jurors to place themselves in Gordon's shoes.  To the contrary, counsel told the jury to award what *Gordon* himself would accept if negotiating *his own* compensation. Therefore, counsel did not make a golden rule argument.

B.  *Reversal is Not Required Due to an Improper Personal Attack*

A key factual dispute at trial was whether defendants warned Gordon to not walk on the roof.  Janet S., an ARC vice president, testified that after Gordon fell and while he was still at the scene, she asked him, "Why did you go out on the roof?  You were told not to go out on the roof"—to which Gordon replied, "I didn't think it would be that bad."

26

In closing argument, Gordon's attorney addressed Janet's testimony, stating:

> "Now, I hope you were paying attention to her demeanor during her
> testimony. There was almost a flash of malice in there, you know,
> when she was talking about how she was speaking to Mr. Gordon.
> It's like she didn't care a bit whether he was hurt or how badly he
> was hurt. All she cared about was trying to put words in his mouth,
> or trying to get him to say something that would let her off the hook
> because she's the executive in charge of the premises at the time.
>
> "The complete lack of empathy and care that she demonstrated with
> her actions and also that she demonstrated as she was testifying, she
> had an agenda when she went up and spoke to Mr. Gordon and I
> don't think that she is to be believed."

Later in his closing, Gordon's lawyer remarked that ARC was trying to sell the building, and its conduct was motivated by its desire to get the highest price.

For the first time on appeal, defendants assert that Gordon's attorney committed prejudicial misconduct in closing argument by "demonizing ARC," making a "personal attack" on Janet's character, and by inviting the jury to speculate based on unsupported inferences. However, at trial defendants did not object to this claimed misconduct, and nothing indicates a timely objection followed by an instruction to disregard such matters would have been ineffective in curing any potential prejudice. Accordingly, the point is forfeited. (*Horn v. Atchison, T. & S.F. Ry. Co.* (1964) 61 Cal.2d 602, 610 ["Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished."].)[9]

Moreover, even if we were to consider the argument, it lacks merit. It is proper for counsel to argue the witness's credibility based on evidence in the record. (*City of*

---

[9]    On a separate point, the court sustained an objection when Gordon's attorney improperly vouched for his client's credibility.

*Hope National Medical Center. v. Genentech*, *Inc.* (2008) 43 Cal.4th 375, 394.)  Even in a criminal case, "harsh" and "colorful" attacks on the credibility of opposing witnesses are permissible.  (*People v. Arias* (1996) 13 Cal.4th 92, 162.)  Here, based on evidence in the record, Gordon's attorney permissibly remarked that Janet's conduct and demeanor reflected badly on her credibility.  Additionally, ARC was trying to sell the building.  Asking the jury to infer that ARC was motivated to get the highest price is a fair comment on the evidence.  There was no misconduct.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

28